NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN M. FLOYD & ASSOCIATES, INC. | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 03-1473 |
| | : | |
| OCEAN CITY HOME SAVINGS BANK, | : | |
| Defendant, | : | **OPINION** |
| | : | |

This matter has come before the Court on Defendant Ocean City Home Savings Bank's ("Ocean City Bank" or the "Bank") Motion for Summary Judgment, and Plaintiff John M. Floyd & Associates' ("Floyd") Cross Motion for Summary Judgment. Also before the Court is a Motion in Limine filed by Floyd, with his cross motion for summary judgment, to preclude the testimony of the Bank's expert, Nicholas Ketcha ("Ketcha"). For the reasons discussed herein, the Bank's motion for summary judgment is granted as to Floyd's breach of contract and implied warranty of good faith and fair dealing claims. Floyd's cross motion for summary judgment is granted in-part and denied in-part; it is granted as to the Bank's counterclaim for refund of its $25,000 retainer, but denied in all other aspects. Additionally, Floyd's motion in limine is denied as moot because no aspect of Ketcha's testimony was relied upon by the Court in reaching this decision.

### I.  Factual Background

This litigation concerns a contract that was entered into between Floyd and the Ocean City Bank, and allegedly breached when the Bank rejected Floyd's

recommendations and hired a different consulting firm.  On May 16, 2001, a teleconference took place between Paul Esposito ("Esposito"), Regional Sales Director of the Bank, and Mark Roe, Executive Sales Director for Floyd, whereby Roe proposed consulting services for an overdraft privilege program.  (Roe Dep. at 9.)  On June 27, 2001, Roe presented a written proposal (the "Contract") to Esposito, in which Floyd sought to provide certain computer consulting services to the bank in exchange for a $25,000 retainer, out of pocket expenses, and a percentage of future savings as a result of the program.  (See Def.'s Exh. C.)  The Contract called for Floyd to analyze the Bank's current computer systems, make recommendations, create and instal an overdraft privilege program, and train the Bank's employees.  Esposito signed the Contract on August 21, 2001 and Floyd's president, John Floyd, signed the agreement on August 27, 2001.  (Id. at 6.)  It is undisputed that a contract was formed; however, the parties dispute whether the Bank's actions constitute a breach of that agreement.

      The parties dispute the overall goals of the overdraft privilege program.  Esposito testified that one of the Bank's main objectives in the program's implementation was to insure it was fully-automated.  (See Esposito Dep. at 47.)  Further, Esposito states that he had conversations in the summer of 2001 with Rick Wade ("Wade") of Bisys Corporation, the company that provided core processing services to the Bank, concerning compatibility issues with the Bank's existing hardware and the overdraft privilege program.  (Id. at 182.)  In August 2001, Roe testified that he had two phone conversations

with Esposito and Wade in which they discussed compatibility issues. (Roe Dep. at 20.) In the first conversation, Roe testified that he assured Wade and Esposito that Floyd had never encountered a core processing system in which it could not implement the overdraft program. (Id. at 20.) On October 2, 2001, at the request of Esposito, Roe and Floyd technician Eric Hudgins, called Wade to talk about the compatibility problems. Roe's notes from that conversation state:

> After much discussion, thought I had him convinced to let us make our recommendations to the bank, let the bank approve or not approve them, and then Bisys would be contacted to inform them of any programming/modifications that would have to be made.

(Id. at 56.)

Another, and less significant dispute concerned a free checking option, which, Esposito testified, was allegedly communicated to Roe that the Bank was not interested in this feature in the overdraft program. (Esposito Dep. at 20.) Roe admitted that one of the concerns of the Bank was whether this aspect of the program could be modified to have a no free checking program. (Id. at 31-32.) Nevertheless, Roe stated that once the free checking program was presented, the Bank would have the option to approve or disapprove the recommendation. (Id. at 32.) The full-automation and the no free checking options in the overdraft program were not expressly mentioned in the Contract drafted by Floyd.

The Contract called for a four phase implementation. First, was the Analysis Phase where Floyd would identify existing account structures and procedures through

interviews, observation, and review of historical data. (Id. at 3.) Second, was the Presentation Phase, where Floyd would propose recommended changes to the Bank's management, and identify those recommendations that are approved by the Bank. (Id.) These were followed by the Implementation Phase and the Follow-up Phase. (Id. at 4.) The Contract did not include an exclusivity provision, which prohibited the Bank from negotiating and contracting with another consulting firm for a similar program, nor did the Contract prohibit Floyd from selling is overdraft program to other competing banks. The following portions of the Contract are pertinent to the parties' motions for summary judgment:

> Objectives - Our objective is to install our Overdraft Privilege program in Ocean City Home Bank. There will be an emphasis on installing a product that will result in a significant increase in non-interest income without a disproportionate increase in non-interest expense. We will install systems to monitor income and associated costs to ensure the bank is receiving the appropriate income for the designed product. Accomplishing these objectives will result in an estimated increase in first-year pre-tax earnings between $370,000 and $510,000. Moreover, we are so confident that this increase is achievable that we offer our service on a **contingency basis**. (Emphasis added).

(Def.'s Exh. C at 1.)

> Overdraft Privilege Program.
> 1. Perform a comprehensive profile analysis of the banks demand deposit customer base to establish Overdraft privilege limits.
> 2. Perform an analysis of the banks NSF and Overdraft processing and assist the bank in making the necessary changes for an effective overdraft privilege program.
>
> * * *
>
> 8. Assist the bank in the installation of an **automated collection system that interfaces with the core application processing system**. (Emphasis added).

4

(Id. at 1-2.)

### Cost of the Assignment
The cost to your institution of the engagement will be one-third of the first year's quantified net increase in pre-tax earnings plus out of pocket expenses. At the beginning of the assignment the bank agrees to pay **a $25,000 fully refundable retainer**. (Emphasis added). After the recommendations have been installed we will quantify the increased income and the bank agrees to pay monthly one-third of the quantified net increase in pre-tax earnings. **After the bank has recovered the retainer** the bank agrees to make these payments by the 15th of the following month. We will invoice semi-monthly for out-of-pocket expenses.

(Id. at 2.)

### Quantification of Earnings.
**If a recommendation is not approved it will not be included in the fee calculation** (emphasis added). However, if any recommendation, within 24 months of the initial engagement is approved or approved as modified, or initially declined and later approved as recommended or as subsequently modified it will be included in the fee calculation.

(Id. at 3.)

Performance on the Contract began on or about November 5, 2001, when Earl Shipp ("Shipp") was assigned by Floyd to be the project manager for the Contract. (Shipp Dep. at 11.) Shipp testified that he was simply given a copy of the Contract and was told by Roe that the Contract explained the assignment. (Id. at 52.) Roe did not advise Shipp that the Bank had compatibility concerns. (Roe Dep. at 51.) Shipp conducted interviews with the Bank's employees, reviewed the Bank's ledger, and visited competing institutions. (Id. at 41.) On November 27, 200, Shipp presented the results of his work, the "Overdraft Privilege Study," to several of the Bank's officers, including Esposito and the Bank's president. (See Def.'s Exh. G.) The presentation included 32

recommendations, which included a free check service application, but did not address whether the system was to be fully-automated, or if modifications could be made to create a fully-automated system. (Id.)

After the presentation, Esposito testified that the Bank's management met to discuss Shipp's proposal, and that they were disappointed that Shipp's presentation still included recommendations for the free checking option, and that it did not address the automation concerns. (Esposito Dep. at 159-60.) In sum, the Bank's management believed that Shipp presented boiler plate recommendations, and they did not have confidence in Floyd continuing in its implementation of the overdraft program. (Id. at 161-62.) In a December 19, 2001 phone conversation, and followed by a letter dated December 24, 2001, Esposito advised John Floyd that it was not satisfied with the presentation and that it had decided not to implement the Floyd program. (Pl.'s Exh. G.) In a letter dated January 11, 2002, Floyd acknowledged receipt of the Bank's termination letter.

On January 2, 2002, following a referral from another bank, Esposito contacted Pinnacle Financial Strategies, L.L.C. ("Pinnacle") to inquire about implementing an overdraft privilege program at Ocean City Bank. (Esposito Dep. at 193.) On April 18, 2002, the Bank and Pinnacle entered into a Professional Services Agreement and a Software Licensing Agreement, whereby Pinnacle would implement an overdraft privilege program at the Bank. (See Def.'s Exh. J.)

The Bank is seeking summary judgment on Floyd's claims of breach of contract and breach of the implied warranty of good faith and fair dealing, and Floyd has filed a cross-motion for summary judgment on these same claims, as well as the Bank's counterclaim for return of the $25,000 retainer.

## II.  Standard for Summary Judgment

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the fact finder. Big Apple

8

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Moreover, the standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. Weissman v. United States Postal Serv., 19 F. Supp. 2d 254 (D.N.J. 1998). When ruling on cross-motions for summary judgment, the court must consider the motions independently, Williams v. Philadelphia House Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., 475 U.S. at 587.

### III. Analysis

In a diversity case, the Court must apply the forum state's choice of law rule. General Star Nat. Ins. Co. v. Liberty Mut. Ins. Co., 960 F.2d 377, 379 (3d Cir. 1992) (citation omitted). With respect to contract disputes such as this, the New Jersey Supreme Court has held that "the law of the place of the contract will govern the determination of the rights and liabilities of the parties." State Farm Mut. Auto. Ins. Co. v. Simmons Estate, 417 A.2d 488 (N.J. 1980).

#### A. Breach of Contract Claim

Where the terms of a contract are clear and unambiguous, it is the court's duty to enforce the contract terms as written. Levison v. Weintraub, 521 A.2d 909 (N.J. Super. Ct. App. Div. 1987), certif. denied, 527 A.2d 470 (N.J. 1987). Courts may not rewrite a contract merely because one might conclude "it might well have been

functionally desirable to write it differently." Brick Twp. Mun. Util. Auth. v. Diversified R.B.&T., 409 A.2d 80-6 (N.J. Super. Ct. App. Div. 1979). Furthermore, it is a well settled legal principle that a party to a contract is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she had a different, secret intention from that outwardly manifested. Domanske v. Rapid-American Corp., 749 A.2d 399 (N.J. Super. Ct. App. Div. 2000) (quotation omitted). Thus, a party cannot be relieved from the language of an agreement simply because it had a secret, unexpressed intent that the language should have an interpretation contrary to the words' plain meaning. Schor v. FMS Financial Corporation, 814 A.2d 1108 (N.J. Super. Ct. App.Div. 2002). Finally, where any ambiguity appears in a written agreement, the writing is to be strictly construed against the party preparing it. In re Miller, 447 A.2d 549 (N.J. 1982).

Floyd argues that the Bank breached its contract when (1) the Bank implemented any of Floyd's 32 recommendations, and particularly any overdraft privilege program regardless who implemented it; and, (2) the Bank did not pay the fee agreed to in the parties' contract. (Pl. Br. at 10.) The Bank contends that there was no breach in the contract, but rather, the Contract enabled the Bank at its discretion to reject Floyd's recommendations and establish a relationship with another consulting firm. The Bank also asserts that it is entitled to the $25,000 "fully-refundable" retainer it paid at the initiation of Floyd's services.

The express terms of the contract all weigh in favor of the Bank's position, that it was free to walk away from the relationship once the recommendations were made, and rejected by the Bank. The contract called for a four-step implementation, and "Step Two Recommendations Phase" stated that Floyd was to make recommendations and that Floyd was to identify those recommendations approved by the Bank. Only those recommendations the Bank approved would be implemented. Further, the first paragraph of the Contract stated, "Moreover, we are so confident that this increase is achievable that we offer our service on a contingency basis." (Def.'s Exh. C at 1.) As written, Floyd only stood to make money if the overdraft program was implemented and the Bank was able to recoup earnings from the program. In this regard, the Contract's language is unambiguous and there was no breach of the Contract by the Bank. The parties dispute the facts concerning the alleged assurances made, and the Bank's ability to reject recommendations; yet, these facts are not relevant because the Contract did not prohibit the Bank for severing the relationship when it did. Moreover, the disputed facts on why the Bank made its decision not to continue with Floyd, is also of no consequence.

The Bank did not breach the Contract by implementing the Pinnacle overdraft program. Floyd's interpretation of its Contract places an unnatural meaning on how it was to be paid, as stated in the "Quantification of Earnings" provisions. The argument that Floyd was entitled to compensation if any consulting company implemented any of the same recommendations made by Floyd, within 24 months of the initial agreement, is

not supported by the entirety of the agreement because no mention was made of this contingency.  The fact that there was no exclusivity or black-out provisions in the Contract supports the conclusion that the parties intended that the Bank would be free to contract with another consulting firm to provide similar services.  Furthermore, there was no "kick-back" or penalty provisions, other than the retainer, which entitled Floyd to royalties in the event the Bank choose another vendor in the intervening time between approval and implementation.  Thus, the Contract does not support the contention that the Bank's conduct constitutes a breach of the Contract.

Presumably, a follow-on consulting firm such as Pinnacle would make several identical recommendations to the Bank in the development of a similar overdraft privilege program.  There is some acknowledgment of this in Shipp's testimony, where he revealed that some of the 32 recommendations were standard "boiler plate" provisions that would later be customized to fit the needs of Ocean City Bank.  (See Shipp Dep. 133-135.)  Nonetheless, Floyd urges that because Pinnacle installed an overdraft privilege program on the heels of Floyd's rejection, it is entitled to payment because Pinnacle implemented Floyd's recommendations.  The submissions do not support this contention because evidence was not provided that indicate that this is what occurred.  The Bank underwent a similar phased-implementation process with Pinnacle, whereby the Bank approved the Pinnacle program after several months of analysis.  In a light most favorable to Floyd, an inference cannot be made that the Bank, by way of Pinnacle, implemented any of Floyd's

preliminary, and uncustomized recommendations. Therefore, the Bank did not breach the Contract by hiring Pinnacle.

The language of the Contract clearly and unambiguously provided that it was <u>contingent</u> on the Bank's successful implementation of Floyd's overdraft privilege program. Additionally, the Bank was able to, and did, reject all of the recommendations made by Floyd in a letter sent by Esposito to Floyd on December 24, 2001. Hence, it was not a breach of the contract for the Bank to approve the recommendations of Pinnacle and implement the Pinnacle overdraft privilege program. Despite all favorable inferences drawn in favor of Floyd, there is no genuine issue of material fact as to its breach of contract claim. Therefore, summary judgment will be granted as to Ocean City Bank.

### B. Implied Duty of Good Faith and Fair Dealing

Despite the grant of summary judgment on Floyd's breach of contract claim, this allegation is not duplicative, and therefore, warrants an independent analysis under New Jersey law. See <u>Automated Salvage Transp., Inc. v. NV Koninklijke KNP BT</u>, 106 F. Supp. 2d 606 (D.N.J. 1999) An implied duty of good faith and fair dealing is implied into all contracts in New Jersey. <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 690 A.2d 575 (N.J. 1997) (citing cases). The New Jersey Supreme Court explained the duty as requiring that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Id.</u> (quoting <u>Palisades Props., Inc. v. Brunetti</u>, 207 A.2d 522 (N.J. 1965)). The implied covenant is an independent duty

13

and may be breached even where there is no breach of the contract's express terms. See Sons of Thunder, 690 A.2d at 588 (citing Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc. 351 A.2d 349 (N.J. 1976)).  Crucial to this determination is evidence of bad motive or intention; thus, "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive."  Wilson v. Amerada Hess Corp., 733 A.2d 1121 (N.J. 2001).

     Floyd alleges that the Bank by its actions, failed to act, either or both, thwarted or frustrated Floyd in its performance of the contract between the parties.  (See Compl. Count II.)  Floyd's brief alleges that this implied covenant was breached because, the Bank kept the rejection decision from Floyd for "some time," the Bank initiated the termination on a "flimsy pretext," the Bank was of little help in getting Bisys to cooperate with Shipp.  (Pl. Br. at 16-17.)  These allegations, however, are not wholly accurate based on the submission of the parties.

     First, it appears that Shipp's presentation was on November 27 and the Bank's desire to terminate the relationship was communicated by telephone on December 19 (followed by the December 24 letter); thus, in less than a month the Bank reached its conclusion with nominal effects on Floyd since Floyd had the $25,000 retainer and was being paid for out of pocket expenses.  This is not evidence of bad faith or improper motive.  Second, whether the Bank's stated reasons for rejecting Shipp's recommendations were "flimsy" is beside the point.  The Contract allowed the Bank to

reject the Floyd recommendations for any reason during the "Presentation Phase" of the implementation. Moreover, the weight of the evidence here indicates that the Bank's management had a legitimate reason for its rejection of the recommendations; namely, that they lost confidence in Shipp, and believed that the Floyd program was not fully-compatible and fully-automated. Finally, it seems that it was Shipp's duty to initiate contact with Bisys and understand the compatibility issues involved since he was after all the computer consultant. It is undisputed that at least Roe made liaison with Bisys on several occasions and was made aware of the Bank's compatibility concerns. No evidence has been offered that the Bank improperly interfered with Floyd's communication with Bisys.

In drawing all favorable inferences in favor of Floyd, there is no genuine issue of material fact as to whether the Bank actions "injured [Floyd's] right . . . to receive the fruits of the contract." <u>Pallisades Properties, Inc.</u>, 44 N.J. at 130. There are no facts to substantiate a claim of bad faith or improper motive on the part of the Bank. Moreover, Plaintiff's bad faith allegation is especially problematic since the Contract that it drafts attracts potential clients with appealing statements such as "we are so confident that this increase is achievable that we offer our service on a contingen[t] basis" or "If a recommendation is not approved it will not be included in the fee calculation," and then files suit, alleging bad faith, once the potential client takes them up on its offer. Therefore, Floyd fails to sustain a claim of breach of the implied covenant of good faith

15

and fair dealing, and summary judgment is granted in favor of the Bank on this claim.

### C. Bank's Counterclaim

The Bank's counterclaim that it is still owed the $25,000 retainer does not have traction based on the language of the Contract. Naturally, at the beginning of the arrangement, Floyd appreciated some risk because it had to spend considerable time working with the customer before its overdraft program was implemented and began generating revenue. To hedge its risk, Floyd required a $25,000 retainer that was to be offset against future revenues. The "fully-refundable" aspects of the retainer were spelled out in the "Cost of Assignment" paragraph in the Contract. Importantly, the clause stated, "After the Bank has recovered the retainer that Bank agrees to make these payments by the 15th of the following month." (Def.'s Exh. C at 2.) Thus, the retainer, was to be used as an offset against "one-third of the first year's quantified net increase in pre tax earnings plus out of pocket expenses." (Id.)

The juxtaposition of the retainer with the "Cost of Assignment" provisions undermine the Bank's argument that they are entitled to a refund of the retainer now that they have decided not to work with Floyd. A retainer is used for just this situation, and the Contract's usage of the term is synonymous with the word's commonly understood meaning. Therefore, summary judgement will be granted as to Floyd on the Bank's counterclaim that sought recovery of the retainer.

## VI.  Conclusion

For the reasons set forth above, the Bank's Motion for Summary Judgment will be granted as to Floyd's breach of contract and breach of the implied covenant of good faith and fair dealing claims.  Floyd's Cross Motion for summary judgment will be granted in-part and denied in-part.  Floyd's motion is granted as to the Bank's counterclaim for a refund of the $25,000 retainer that it paid; however, Floyd's cross motion is denied in all other aspects.  Floyd's motion in limine will be denied as moot.  The accompanying Order is entered.

/S/ Joseph H. Rodriguez_____
JOSEPH H. RODRIGUEZ
United States District Judge

Dated:  August 18, 2005_____