**DAVID A. SOKASITS, ESQ.**
**ATTORNEY AT LAW**
**132 JACKSON STREET, #1S**
**HOBOKEN, NEW JERSEY 07030**
**(201) 963-2196**
*Attorney(s) for* **Plaintiff, John M. Floyd & Associates, Inc.**

| | |
|---|---|
| **JOHN M. FLOYD & ASSOCIATES, INC.,** a Texas corporation, <br><br> *Plaintiff(s),* <br><br> *vs.* <br><br> **OCEAN CITY HOME BANK,** a New Jersey savings bank, <br><br> *Defendant(s).* | **UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY** <br><br> **Civil Action No.:03-CIV-1473 (JHR)** <br><br><br> **PLAINTIFF'S TRIAL BRIEF** |

-1-

## Table of Contents and Authorities

Table of Contents and Authorities ............................ 2
**Table of Contents**
Statement of facts and procedural history ..................... 3

ARGUMENT .................................................... 10

I.  The parties' contract should be enforced and plaintiff
should receive damages in the amount of $106,927.78. ......... 10
    A.  The parties' have an enforceable contract which
    should be enforced. ..................................... 10
    B.  The defendant breached the parties' contract. ....... 12
    C.  Defendant is liable to the plaintiff for damages. ... 15
II.  The Defendant may not argue any alleged parol evidence
to explain, modify or otherwise reinterpret the terms of the
parties' contract. ........................................... 15

CONCLUSION ................................................. 18

**Table of Authorities**
Slip opinion, John M. Floyd & Associates, Inc. v.  Ocean City
Home Savings Bank, Docket No.:  05-4155
(3d Cir. November 16, 2006). ........................ 9, 10, 16

Casey v. Planned Parenthood of Southeastern Pennsylvania,
14 F.3d 848, 856-857 (3d Cir. 1994). ........................ 16

Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435,
608 A.2d 280 (1992). ........................................ 11

Kutzin v. Pirnie, 124 N.J. 500, 507 (1991). ................. 17

Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 341,
173 A.2d 258 (1961). ........................................ 14

West Caldwell v. Caldwell, 26 N.J. 9, 24-25,
138 A.2d 402 (1958). ........................................ 11

Friedman v. Tappan Development Corp., 22 N.J. 523, 531,
126 A.2d 646 (1956). ........................................ 11

Leitner v. Braen, 51 N.J. Super. 31, 38-39,
143 A.2d 256 (App. Div. 1958). .............................. 11

Farnsworth, Contracts, Sec. 8.16 (1990). .................... 13

2 Restatement, Contracts 2d, sec. 241 at 237 (1981). ........ 14

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In May, 2001, the plaintiff, John M. Floyd & Associates
(Floyd") and the defendant, Ocean City Home Bank ("Ocean City" or
the "Bank") began negotiations over Floyd's offer to be engaged
by the Bank, working toward the objective of Floyd's providing
recommendations, know-how and consulting service to the Bank to
implement an "Overdraft Privilege Program" ("ODP").  ODP consists
of modifications to the Bank's computer and other operating
systems such that an account-holder who overdraws a check has
that check covered by the bank, up to certain preset limits, and
the bank would then charge the customer a fee for the service.

To this end, on June 27, 2001, Floyd, through its regional
sales director, Mark Roe ("Roe"), presented the Bank's Vice
President, Paul Esposito ("Esposito"),with a letter document
setting forth the objectives and main points of the Overdraft
Privilege program, as well as setting forth in some detail the
performance Floyd would provide the Bank toward accomplishing the
objectives and purposes set forth therein, the price Floyd would
charge for its services, and the terms and conditions relative to
payment.  The Overdraft Privilege program is, at core, intended
to increase a Bank's profits and, based upon its confidence in
its product, Floyd offers its services on a contingent fee basis
- in short, one-third of the Bank's first year's increase in pre-
tax earnings plus out of pocket expenses.  The parties agreed in

-3-

their contract to the method by which the earnings increase would be quantified.  Ocean City also agreed to pay Floyd a refundable $25,000.00 retainer at the beginning of the assignment.  The issue of the retainer is no longer part of the case.

After having had the Floyd contract for nearly two months, the Bank's Board of Directors approved entering into it. Pursuant to this authorization, Esposito executed it on behalf of the Bank on August 21, 2001 and returned the executed copy to Floyd's offices, where it was executed by Floyd's president, John M. Floyd, on August 27, 2001.  The Bank never asked for any changes to the contract document nor did it indicate any issues or difficulty with its terms.

Performance of the contract between the parties began in late October 2001 at the Bank's request, when Floyd's representative Earl Shipp ("Shipp") arrived at the Bank's offices and commenced work.  This performance continued for about a month thereafter, through Shipp's presentation on November 27, 2001 and for approximately a week thereafter.   Implementation of the Overdraft Privilege program contemplated a series of presentations at various stages of the project.  Shipp made the first presentation on November 27, 2001 to officers of the bank, including Esposito and the President, Brady.

In this presentation, Shipp made a series of 32 recommendations to the Bank, which were in furtherance of the

-4-

Overdraft Privilege program and based upon his work to date. These recommendations are, by design, capable of being approved by the Bank or not.  The parties' contract was designed around these recommendations and specifically provided as to paying Floyd that:

> "If a recommendation is not approved, it will not be included in the fee calculation.  However, if any recommendation, within 24 months of the initial engagement is approved or approved as modified, or initially declined and later approved as recommended or as subsequently modified it will be included in the fee calculation."

Following Shipp's presentation, several of the Bank's officers who attended, Esposito and its President Brady among them, then retired to a private meeting in which they decided to terminate the services of Floyd.  Esposito, made clear, though, that the Bank did not inform Shipp, or any one else from Floyd, of this decision for some time.  The Bank kept Shipp at work for another week, and only then informed him to take some time off from the project.  It was not until December 24, 2001, that the Bank wrote Floyd advising of their decision to terminate Floyd.

In January, 2002, Floyd's president, John M. Floyd, responded by letter and indicated Floyd's willingness to continue performance for Ocean City.

Beginning in January, 2002, the Bank negotiated with and then retained another consultant, Pinnacle Financial Strategies, to implement an overdraft privilege program, which was completed and brought "on-line" in November 2002.  The Pinnacle program, as

-5-

implemented., included implementing recommendations Floyd had made: i.e, some of Floyd's recommendations were "...approved or approved as modified, or initially declined and later approved as recommended or as subsequently modified...", meeting the criteria for inclusion in the fee calculation.

Most particularly, Ocean City implemented "...as recommended or as subsequently modified..."  a number of Floyd's recommendations, most prominent among them Recommendations 1.05, 1.06, 1.07, 1.08, 1.09 and 1.11.  These all implicate amending the bank's general ledger to establish new, separate  "General ledger accounts" to accommodate the data relevant to and management of the Overdraft Privilege program.  Ocean City created such new "general ledger accounts".

In the course of discovery, the Bank alleged several reasons for Floyd's termination, among them that the Bank was offended by the inclusion in Shipp's presentation of recommendations for free checking, that the Bank wanted a "fully automated" overdraft privilege system, and that the Bank "lost confidence" in Floyd after Shipp's presentation.  These were, it later proved out, transparent pretexts.  By way of example, as to the issue over free checking, the unchallenged text of the parties' contract sets forth in the eight points of the Overdraft Privilege program, on its' page 1:  "4.  Assist the bank in improving (installing) low to no cost checking deposit products." Floyd had

done exactly what the contract required.  The Bank was, per the
terms of the contract, under no obligation to accept or implement
any of Floyd's recommendations.  Rather, it was obligated to pay
Floyd in the event any recommendation was "approved or approved
as modified, or initially declined and later approved as
recommended or as subsequently modified" within 24 months of the
date of the engagement, August 27, 2001.

As to the contention that the bank wanted a "fully
automated" system, in discovery it became clear the Bank had a
difficult time defining the term "fully automated" and has
conceded that the term "fully automated" appears nowhere in the
parties' contract.

Moreover, as to the issue of alleged "loss of confidence",
the Bank never contacted anyone from Floyd to advise them of any
such difficulty with Shipp.

At a later point, the defendant alleged that Floyd's
recommendations were "Boilerplate, "Generic" or "Canned", and
that they were therefore not deserving of being the basis for
enforcement of the contract.  As discussed <u>infra</u>, the Court of
Appeals dismissed that defense  argument entirely.

On April 1, 2003, Floyd filed its two-count complaint in
this Court seeking damages for defendant's breach of contract and
breach of the implied covenant of good faith and fair dealing.
The latter count pertained more to the termination of the

-7-

plaintiff.  Ocean City filed an answer and counterclaim.
Jurisdiction was pursuant to 28 U.S.C. §1332 and venue proper
because defendant is within this State.  The case proceeded
through discovery.

Discovery indicated that the relevant first year for
determining the fee for the ODP would be November 2002 through
October 2003. The fee calculation, in short one-third of the
Bank's first year's increase in pre-tax earnings plus out of
pocket expenses would require analysis of that year, and the
"baseline" year of November 2001 through October 2002 against
which to measure it.  Plaintiff's analysis of the Bank's own data
and using the formula agreed in the parties contract indicated
the amount of fee due Floyd is of $106,927.78.

In April, 2005 the defendant moved, and in May, 2005 the
plaintiff cross-moved, for summary judgment.  Following an
additional defense motion to amend its answer, this Court decided
the summary judgment motions on August 18, 2005.  This Court
granted defendant's motion seeking to dismiss the plaintiff's
complaint for breach of contract and breach of the implied
covenant of good faith and fair dealing, and granted plaintiff's
cross-motion to dismiss the defendant's counterclaim seeking
return of the retainer. This disposed of all issues as to all
parties.

The plaintiff then timely appealed to the United States

-8-

Court of Appeals for the Third Circuit from the entire summary
judgment dismissing its complaint.  Ocean City did not cross-
appeal the dismissal of its counterclaim.  The issues of the
counterclaim are therefore removed from the case.  After briefing
and oral argument in the Court of Appeals, that Court rendered
its opinion on November 16, 2006.

In its opinion, the Court of Appeals reversed the prior
summary judgment as to Floyd's breach of contract claim and
allowed the dismissal of the claim for breach of the covenant of
good faith and fair dealing to stand.  The Court of Appeals held
"...that disputed factual issues remain as to whether or the
extent to which the Bank implemented JMFA's recommendations."
(Slip op. at 2).

Moreover, the Court of Appeals decided that Ocean City's
claim that the alleged "boilerplate", "generic" or "canned"
nature of some of Floyd's recommendations was immaterial to
deciding whether Floyd was entitled to compensation for their
implementation.  After addressing the plain language of the
parties' contract, the Court of Appeals decided:

> In granting the Bank's motion for summary judgment
> on the breach of contract claim, the District Court
> interpreted the contract as entitling JMFA to payment only
> for recommendations that were specific to the Bank, but not
> for the generic recommendations involved in implementing an
> overdraft privilege program. The District Court
> characterized many of JMFA's recommendations as
> "boilerplate," noting that they were based in whole or in
> part on "Previous Studies conducted by [JMFA]." Based on

> this characterization, the District Court concluded that the
> Bank was entitled to summary
> judgment.
>       But whether JMFA's recommendations were "boilerplate"
> is immaterial. The
> parties' contract makes clear that if the Bank implemented
> "any" of JMFA's recommendations within 24 months of JMFA's
> proposal, JMFA would be entitled to compensation. In other
> words, the originality of JMFA's recommendations is beside
> the point for purposes of compensation; the only limitation
> on JMFA's right to recover is temporal.

Slip op. at 7-8.

Thus, the central issue remaining for trial is determining

the factual dispute of whether the Bank implemented any of

Floyd's recommendations, i.e, whether any of them were

"...approved or approved as modified, or initially declined and

later approved as recommended or as subsequently modified...".

There is not and has not been any dispute over whether the

24 months' period provided in the contract was satisfied; all the

events necessary to lead to liability took place within 24 months

of the execution of the contract.

**ARGUMENT**

**I.  The parties' contract should be enforced and plaintiff should
receive damages in the amount of $106, 927.78.**

    **A.  The parties' have an enforceable contract which should
be enforced.**

To establish a contract claim a plaintiff must prove that

the parties entered into a contract containing certain terms, the

plaintiff did what the contract required the plaintiff to do, the

defendant did not do what the contract required the defendant to

-10-

do breaching the contract, and the defendant's breach caused a loss to the plaintiff.

The law governing the existence of a contract and the essential elements thereof is well set forth in the leading cases of <u>Weichert Co. Realtors v. Ryan</u>, 128 N.J. 427, 435, 608 A.2d 280 (1992), <u>West Caldwell v. Caldwell</u>, 26 N.J. 9, 24-25, 138 A.2d 402 (1958), <u>Friedman v. Tappan Development Corp.</u>, 22 N.J. 523, 531, 126 A.2d 646 (1956) and <u>Leitner v. Braen</u>, 51 N.J. Super. 31, 38-39, 143 A.2d 256 (App. Div. 1958).  These cases state that to establish that this contract existed, plaintiff must prove the following:

A "meeting of the minds" — the parties reached an agreement to do what is alleged; offer and acceptance — one party communicated a willingness to enter into the agreement and the other party gave some outward indication that the agreement was accepted;  Consideration — each party gave or promised something of value to the other;  Certainty — the terms of the agreement were reasonably certain.

As to a meeting of the minds and offer and acceptance, these elements have been established by the discovery in this case. Both parties understood what each agreed to do or not to do. Moreover, during discovery the deposition testimony of Defendant's Vice President Esposito unequivocally indicated not only that the plaintiff had made an offer, but that the defendant

-11-

had accepted it and executed it.

As to consideration, there is likewise no real dispute that this element exists.  The plaintiff performed in accordance with the parties' contract until defendant terminated plaintiff's performance.  Defendant, on the other hand, promised to pay if it implemented one or more of plaintiff's recommendations within 24 months of the execution of the parties' contract.  This exchange of performance and promises is sufficient consideration.

As to certainty, there is likewise no room for disputing this element exists.  The contract is unambiguous and clear.

There was a contract between the parties.

**B.   The defendant breached the parties' contract.**

The defendant breached the parties' contract by implementing one or more of the plaintiff's recommendations within 24 months of the execution of the agreement, i.e., before August 17, 2003. As to any of the thirty-two recommendations implementation, per the terms of the contract, means the recommendation was "...approved or approved as modified, or initially declined and later approved as recommended or as subsequently modified...".

As discussed above, and stated by way of example, the defendant has implemented "...as recommended or as subsequently modified..."  a number of Floyd's recommendations, most prominent among them Recommendations 1.05, 1.06, 1.07, 1.08, 1.09 and 1.11.  These all implicate amending the bank's general ledger

-12-

to establish new, separate  "General ledger accounts" to
accommodate the data relevant to and management of the Overdraft
Privilege program.  Ocean City created such new "general ledger
accounts".

The breach of the contract came about when the defendant
failed to pay the plaintiff and, subsidiarily, failed to provide
the plaintiff with the financial information to enable the
plaintiff to calculate the amounts due.  The parties' contract
provided that the defendant would provide that information to the
plaintiff.  The result of the breach was that the plaintiff did
not receive the performance it was entitled to and expected from
defendant, i.e., payment.  Nonperformance by a party is a breach
of the contract.  Defendant breached the contract.

Moreover, the breach of the contract was material.  Floyd
was not paid.  While it is generally stated that determining
whether a breach of a contract is material, see Farnsworth,
Contracts, Sec. 8.16 (1990),  there is little doubt that non-
payment is material.  The Restatement of Contracts sets forth a
number of criteria for determining whether a breach is material:

    the extent to which the injured party will be deprived of
    the benefit which he reasonably expected,
    the extent to which the injured party can be adequately
    compensated for the part of the benefit of which he will be
    deprived,
    the extent to which the party failing to perform or to offer
    to perform will suffer forfeiture,
    the likelihood that the party failing to perform or to offer
    to perform will cure his failure, taking account of all the
    circumstances including any reasonable assurances, and

the extent to which the party failing to perform or to offer
to perform comports with standards of good faith and fair
dealing.
2 Restatement, Contracts 2d, sec. 241 at 237 (1981).

The defendant's breach was material.  As to the first of
these, the breach totally deprived Floyd of that which it
reasonably expected - payment.  This went to the heart of
plaintiff's expectations.  As to the second, since the breach
caused purely a loss of money to Floyd, damages can make Floyd
whole.  As to the third, there will be no forfeiture against the
defendant, as they contracted to pay, and would only be required
to do that which they contracted for.  As to the fourth, there is
no likelihood that the defendant can cure its breach other than
by payment.  At this point assurances are irrelevant.  As to the
last, the Court of Appeals has excised the covenant of good faith
and fair dealing from the case, though it is correct to say that
defendant's conduct did not comport with those standards.

When the defendant terminated the plaintiff's performance,
it could be considered an anticipatory breach of the contract.
See Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 341,
173 A.2d 258 (1961).  But, nonetheless, it was a breach.  There
is little doubt that the defendant indicated it wanted plaintiff
to stop its performance when it terminated that performance on or
about December 24, 2001. But, when it terminated plaintiff's
performance, plaintiff had already rendered the recommendations
and defendant had received them.  Since the recommendations'

-14-

implementation, regardless of whether they were initially
rejected or were modified, was the triggering event for liability
to pay, the only way for defendant to avoid liability was to not
implement any of them until after August 27, 2003. That it did
implement some of them before that date and then did not pay,
breached the parties' contract. Even so, in January 2002,
plaintiff indicated its willingness to continue performance and
defendant declined that opportunity.

Defendant breached the parties' contract, the breach was
material, and defendant should be held liable.

### C.  Defendant is liable to the plaintiff for damages.

In this case, the quantum of damages is the amount which
plaintiff should have been paid by the plaintiff.  The parties
had provided a formula for calculating this amount, and the
calculation yields a definitive amount.  This amount is the sum
of $106, 927.78.  This is the amount which it will take to make
the plaintiff whole.  There is likewise no reasonable dispute
that the defendant was the only party whose conduct caused, or
could have caused, the breach of contract and that the
plaintiff's damages stemmed directly from that breach.

## II.  The Defendant may not argue any alleged parol evidence to explain, modify or otherwise reinterpret the terms of the parties' contract.

At various points in this case, the defense has indicated an
intention to argue that parol evidence would or should be

-15-

admissible to explain, modify or otherwise reinterpret the parties' contract.  Parol evidence is not admissible in this case, because the parties' contract does not require it to explain, modify or otherwise reinterpret the parties' contract. This defense argument must be refused.

In deciding the appeal, the Court of Appeals had before it the parties' contract and started its analysis from the plain language of the parties' contract, stating:

> To determine the propriety of summary judgment on the breach of contract claim,we will begin by examining the plain wording of the contract. The Supreme Court of New Jersey has posited that "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and we must enforce those terms as written." Kutzin v. Pirnie, 124 N.J. 500, 507 (1991)(quotation omitted). See M.J. Paquet,Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002)("Generally, the terms of an agreement are to be given their plain and ordinary meaning.").

Had the terms of the contract not been clear and unambiguous, the Court of Appeals surely would have noted that issue.  It did not.  It decided the plain and ordinary meaning of the language of the contract was sufficient. This is a part of the law of the case, and entitled to respect and obedience under the Mandate Rule.  Casey v. Planned Parenthood of Southeastern Pennsylvania, 14 F.3d 848, 856-857 (3d Cir. 1994).

It is axiomatic that parol evidence is only admissible when necessary to explain or give meaning to ambiguous or unclear contractual language.  To admit it in any other context is to give in to the urge to rewrite the parties' contract to make it

-16-

"better".  It is equally axiomatic that Courts do not remake the parties contract for them; where the terms are clear and unambiguous, they are enforced as written.  Kutzin v. Pirnie, supra, 124 N.J. at 507.  The terms of the parties' contract here are clear and unambiguous and deserve to be enforced as written. Parol evidence is therefore both unnecessary and inadmissible, and any defense argument therefor should be refused.

Accordingly, defendant's attempts to introduce parol evidence or otherwise vary the plain terms of this unambiguous contract must be barred.

## CONCLUSION

For all the reasons herein stated, the Court should enter judgment in favor of the plaintiff in the amount of $106,927.78.

Respectfully submitted,


Dated:  May 14, 2007                    s/David A. Sokasits
                                        DAVID A. SOKASITS